**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| UNION PACIFIC CORPORATION, UNION PACIFIC RAILROAD COMPANY and LOUP LOGISTICS COMPANY LLC, | CASE NO. 8:24-cv-114 |
| Plaintiffs, | |
| vs. | **COMPLAINT** |
| CREIGHTON REINHARD, SOO LINE CORPORATION, AND SOO LINE RAILROAD CO. d/b/a CANADIAN PACIFIC KANSAS CITY, | |
| Defendants. | |

Plaintiffs, Union Pacific Corporation ("UPC"), Union Pacific Railroad Company ("UPRR"), and Loup Logistics Company LLC ("Loup") (collectively, "Union Pacific" or the "Company"), through the undersigned counsel, hereby bring the following Complaint against Defendants Creighton Reinhard ("Reinhard"), Soo Line Corporation, and Soo Line Railroad Co., d/b/a Canadian Pacific Kansas City ("Canadian Pacific") (the Soo Line entities are collectively referred to as "CPKC") (the CPKC entities, together with Reinhard, are collectively referred to as "Defendants"), and allege as follows:

## <u>INTRODUCTION</u>

1.  Union Pacific operates an interstate Class I freight railroad linking 23 states in the western two-thirds of the United States. Union Pacific ships everything from food, forest products, automobiles, equipment and manufacturing parts, agricultural products, coal, and chemicals, among many other products. And its shipping capabilities extend beyond the railway; using its

network of business partners, it also offers intermodal transport,[1] which is door-to-door service throughout the United States.

2. Soo Line Corporation is the direct parent company of CPKC. The Soo Line entities' parent company formed as a result of a merger between Canadian Pacific Railway and Kansas City Southern in 2023, and these entities provide transportation services in competition with Union Pacific and serve a large geographic area of the United States, particularly in the south central, upper and central Midwest, and Texas markets, including in Nebraska. The actions taken by CPKC as described in this Complaint were taken in collaboration amongst, and for the benefit of, all three named Defendants. Upon information and belief, Soo Line Corporation and Canadian Pacific do not respect the corporate form, act jointly in all respects, and have acted in concert with respect to all actions described herein. As a result, with respect to the allegations in this Complaint, and upon information and belief, all actions taken by CPKC are attributable to Soo Line Corporation, and vice versa.

3. Both Union Pacific and CPKC provide intermodal transport services for a variety of industries, including the automotive industry. Union Pacific provides intermodal transport through its own subsidiary Intermodal Marketing Company ("IMC"), Loup Logistics Company LLC ("Loup"), whereas CPKC provides this service by contracting with third-party IMCs.

4. Reinhard is a former Union Pacific director-level employee who, just a few months prior to his resignation, led the Auto Parts Intermodal Sales function for Loup, a wholly owned Union Pacific subsidiary. In his role, and because of the promises he made to safeguard Union Pacific's and Loup's confidential and proprietary information, Reinhard was afforded with

---

[1] Intermodal shipping refers to moving freight by two or more modes of transportation, such as by rail, truck, and ship.

complete access to, among many other things, key financial and sales metrics, including per diem rates, fuel charge cost components, pricing and margin information, contract term lengths and pricing structures, and critical customer relationships.  Disgruntled by a recent reorganization within Union Pacific, however, Reinhard resigned from Union Pacific on February 12, 2024, and, despite repeated requests, refused to provide an accurate description of his new job.  Union Pacific recently learned that Reinhard now works for CPKC in an intermodal sales role in the auto parts sector in which he inevitably will misappropriate—and, on information and belief, already has misappropriated—Union Pacific trade secret information to develop CPKC's business and strategies, and to poach Union Pacific key customer relationships—specifically with customers with which he worked while he was at Union Pacific—thereby wrongfully damaging Union Pacific's competitive advantage, goodwill, and revenue.

5.   Union Pacific brings this action to prevent and, if necessary, remediate the irreparable harm from (1) Defendants' actual and inevitable misappropriation and use of Union Pacific's confidential information and trade secrets; (2) Defendants' tortious interference with key Union Pacific customer accounts on which Reinhard worked when he worked for Plaintiffs; (3) Reinhard's brazen breach of his contractual obligations as a former Union Pacific high-level employee; and (4) CPKC's blatant tortious interference with those same obligations.  Among other relief, Union Pacific seeks an order enjoining Defendants from further breaches of their legal and contractual obligations. As to Reinhard specifically, Union Pacific is also filing a demand for arbitration, and thus includes him in this action primarily to obtain preliminary injunctive relief pending the arbitration proceedings.

6.   The stakes of this litigation are incredibly high, as the threatened harm to Union Pacific is irreparable.

## PARTIES

7.  Union Pacific is a corporation organized under the laws of the State of Utah and headquartered in Omaha, Nebraska. Union Pacific stock served as consideration for Reinhard in exchange for his acceptance of the UPC Standard Terms and Conditions for Retention Shares agreements.

8.  UPRR is a corporation organized under the laws of Delaware and headquartered in Omaha, Nebraska.  UPRR was Reinhard's employer at relevant times during his work for the Company.  UPRR is a subsidiary of Union Pacific.

9.  Loup is a corporation organized under the laws of Delaware and headquartered in Omaha, Nebraska.  Loup was Reinhard's employer at relevant times during his work for the Company.  Loup is a subsidiary of Union Pacific.

10. Reinhard is an individual whose last known address is 15141 Himebaugh Avenue, Omaha, Nebraska, 68116.

11. Soo Line Corporation is a corporation organized under the laws of the State of Minnesota and headquartered in Minneapolis, Minnesota, which does business in Nebraska.

12. CPKC is a corporation organized under the laws of the State of Minnesota and headquartered in Minneapolis, Minnesota, which does business in Nebraska.

## JURISDICTION AND VENUE

13. This Court has federal subject matter jurisdiction over Count I, which arises under the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § § 1831, *et seq.*, in accordance with 28 U.S.C. § 1331.

14. Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the remaining Counts of this Complaint because they form part of the same case or controversy as Count I.

15. Under 28 U.S.C. § 1391, venue in this action is proper in this Court because Reinhard resides in this judicial district, he worked for Union Pacific in this judicial district, and a substantial part of the events or omissions giving rise to the claims in the Complaint occurred in this judicial district.

16. CPKC is subject to personal jurisdiction in Nebraska given its continuous contacts with Nebraska and purposeful availment of its laws.

17. CPKC is also subject to personal jurisdiction in Nebraska because it engaged in intentional and tortious conduct that was calculated to harm Union Pacific in Nebraska, including by interfering with Union Pacific's contract with Reinhard in Nebraska and seeking to poach Union Pacific customers and steal Union Pacific trade secrets in Nebraska.

18. CPKC's tortious actions were and are intentional and directed to Union Pacific, knowing it is located in Nebraska.

19. In addition, upon information and belief, CPKC employs Reinhard within Nebraska. As a result of that employment relationship, Reinhard has committed and is committing tortious activities within Nebraska as an agent of CPKC and for CPKC's benefit.

## FACTUAL ALLEGATIONS

**A.   Reinhard Developed and Received Confidential Information and Trade Secrets at Union Pacific**

20. Reinhard first began working for Union Pacific as an Intern in 2006, before starting in a full-time role in 2007.  Since 2007, Reinhard worked in various roles for Union Pacific, until his February 2024 resignation.

21. From October 2018 to October 2023, Reinhard was Director of Auto Parts – Intermodal for Loup.  Loup is an IMC that contracts with, among other industries and companies, original equipment manufacturers ("OEM") for door-to-door intermodal shipping services of automotive

parts.  Reinhard's role put him in direct sales competition with other IMCs, such as Schneider National, Inc., JB Hunt, Swift Transportation, and Hub Group, which use Union Pacific and other carriers, such as CPKC, to move goods throughout Mexico and North America.

22. In his roles at Union Pacific, Reinhard actively developed and received Confidential Information and Trade Secrets (each as defined in the Terms and Conditions, as described below) and he was required to have access to, and to use, extensive financial and economic information belonging to Union Pacific.  For example, he was intimately familiar with Union Pacific's pricing, profit margins, economic analyses, competitive advantages in the marketplace, including relating to the Company's operations strategy, future business and marketing plans, route structures, transportation control systems, dispatch systems, service product offerings, revenue information, customer information, information relating to the Company's intermodal operations, transportation plans, and Union Pacific's growth plans and associated capital investments.  These types of information are all highly confidential and sensitive and, if they fell into the hands of CPKC or IMCs that work with CPKC, would enable CPKC and those IMCs (working in concert) to compete unfairly with Loup and with Union Pacific more broadly, and to poach customers with which Reinhard worked while at Union Pacific.

23.     As the day-to-day contact for Loup's key automotive accounts, Reinhard managed detailed aspects of the customer relationships using extensive confidential Union Pacific information.  Reinhard also helped negotiate contracts, provided analysis, research, and forecasting services regarding customers and their industries, and developed strategies to grow and sustain client accounts and meet client goals.  In his position, Reinhard was responsible for all of Loup's customers in the automotive parts space with sales totaling more than **half a billion dollars** annually.

24. After a reorganization, Reinhard accepted a new role as Manager 1 of Industrial Development effective on or about November 1, 2023.  In this position, Reinhard conducted strategic planning and advised on capital plans and infrastructure development.  Further, he stayed abreast of trends in the transit of automotive parts and Union Pacific's cost basis in providing such services.

**B.      Reinhard's Contractual Obligations to Union Pacific**

25. Union Pacific encourages its employees to work hard and safeguard Union Pacific's goodwill, relationships, and information through stock ownership, awarded to select employees as part of the annual compensation process.

26. Ownership in Union Pacific comes with enhanced measures to protect Union Pacific's information and trade secrets and, among other things, requires employees, as appropriate, to agree to confidentiality, non-solicitation, and non-competition agreements.  Reinhard received numerous stock awards during his tenure with Union Pacific and agreed to various iterations of the UPC Standard Terms and Conditions for Retention Shares.[2]

27. In the Terms and Conditions, Reinhard agreed to the following Section 5:

**A.      CONFIDENTIAL INFORMATION AND TRADE SECRETS**

You acknowledge that the Company regards certain information relating to its business and operations as confidential. This includes all confidential and proprietary information concerning the assets, business or affairs of the Company or any customers thereof ("Confidential Information"). You further acknowledge that the Company has certain information that derives economic value from not being known to the general public or to others who could obtain economic value from its disclosure or use, which the Company takes reasonable efforts to protect the secrecy of ("Trade Secrets").

Terms and Conditions ¶ 5.

---

[2]      A copy of Reinhard's 2023 Union Pacific Corporation Standard Terms and Conditions for Retention Shares (the "Terms and Conditions"), to which he agreed, is attached as **Exhibit A**.

28.     Reinhard also acknowledged the following in Section 5 of the Terms and Conditions:

### B.     TYPES OF CONFIDENTIAL INFORMATION OR TRADE SECRETS

You acknowledge that you developed and/or obtained, or have had and will in the future continue to have access to one or more of the following types of Confidential Information or Trade Secrets: information about rates or costs; customer or supplier agreements and negotiations; business opportunities; scheduling and delivery methods; business and marketing plans; financial information or plans; communications within the attorney-client privilege or other privileges; operating procedures and methods; construction methods and plans; proprietary computer systems design, programming or software; strategic plans; succession plans; proprietary company training programs; employee performance, compensation or benefits; negotiations or strategies relating to collective bargaining agreements and/or labor disputes; and policies and internal or external claims or complaints regarding personal injuries, employment laws or policies, environmental protection, or hazardous materials. You agree that any unauthorized disclosures by you to any third party of such Confidential Information or Trade Secrets would constitute gross misconduct.

Notwithstanding the foregoing, in accordance with the Defend Trade Secrets Act of 2016, you will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a Trade Secret that is made (i) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

Terms and Conditions ¶ 5.

29. In the Terms and Conditions, Reinhard also agreed to the following in Section 5:

### C.     AGREEMENT TO MAINTAIN CONFIDENTIAL INFORMATION

You agree to not, unless you received prior written consent from the senior human resources officer or such other person designated in writing by the Company (hereinafter collectively referred to as the "Sr. HR Officer"), or unless ordered by a court or government agency, (i) divulge, use, furnish or disclose to any subsequent employer or, except to the extent necessary to perform your job responsibilities with the Company, any other person, whether or not a competitor of the Company, any Confidential Information or Trade Secrets, or (ii) retain or take with you when you leave the Company any property of the Company or any documents (including any electronic or computer records) relating to any Confidential Information or Trade Secrets.

Terms and Conditions ¶ 5.

30. The Terms and Conditions also contain provisions regarding "**NON-SOLICITATION OF CUSTOMERS**" (Section 5.E), "**NON-SOLICITATION OF EMPLOYEES**" (Section 5.F), and "**NON-COMPETITION**" (Section 5.G).

31. Reinhard agreed to the following noncompete provision in Section 5 (the "Non-Competition Covenant"):

### G.    NON-COMPETITION

In consideration for your employment with the Company, the financial and other benefits you received from that employment, and/or access to Confidential Information and/or Trade Secrets, as defined in this Agreement, you agree that during employment with the Company, and for a period of one (1) year following your departure from the Company, you will not (directly or indirectly, in association with others or otherwise) engage in any activity for a competitive Business (as defined below) in which (i) the use, disclosure, or misappropriation of the Confidential Information and/or Trade Secrets you had access to or obtained during your employment with the Company may provide the competitive Business with a competitive advantage against the Company, and/or otherwise cause harm to the Company; or (ii) you would be in a position to solicit or otherwise contact, on behalf of the competitive Business, any current or prospective Company customers and clients with whom you had personal contact or about whom you learned Confidential Information and/or Trade Secrets. The foregoing includes, without limitation, engagement as an officer, director, proprietor, employee, partner, manager, member, investor (other than as a holder of less than 2% of the outstanding capital stock of a publicly traded corporation), guarantor, consultant, advisor, agent, sales representative or other participant within any State in which the Company does business. For the avoidance of doubt, the term "State" as used in this agreement shall be interpreted to include any legal territory of the United States where the Company does business, including, by way of example, the District of Columbia. Further, for purposes of these Standard Terms and Conditions, the term "Business" means the transportation of goods in interstate commerce and related services in or through or for any State in which the Company or any of its affiliates provides such services directly or indirectly and any other activity that supports such operations including by the way of example but not limitation, marketing, information systems, logistics, technology development or implementation, terminal services and any other activity of the Company or any of its affiliates related to providing such services. This Section (G) is not intended to prevent you from engaging in any activity that is not substantially the same as or competitive with the Company's Business.

32. Reinhard was granted substantial consideration for the foregoing covenants through stock equity grants.

33. Reinhard is free to work for any employer anywhere during his one-year restricted period, so long as he complies with the foregoing reasonable terms as well as any other duties owed to Union Pacific at law or equity.  Reinhard has failed to follow his contractual obligations, however, as CPKC specifically put him in a role (which he accepted) in which he is guaranteed to (1) use, disclose, and misappropriate the Confidential Information and/or Trade Secrets to which he had access or obtained during his employment with Union Pacific, which will provide CPKC with an unfair competitive advantage and harm Union Pacific; and to (ii) solicit, on behalf of CPKC, Union Pacific customers and clients with whom he had extensive personal contact and about whom he learned Confidential Information and/or Trade Secrets.  Union Pacific is not seeking to block Reinhard from continuing his career, even if he happens to be working in an otherwise appropriate role with a competitor.  Rather, it is seeking this Court's intervention to prevent Reinhard and his new employer, CPKC, from irreparably harming Union Pacific by assigning him a role in which his job duties will inevitably lead to such an outcome.

34. CPKC itself recognizes the critical importance of non-competes to prevent unfair competition and protect industry trade secrets, as demonstrated by the fact it recently demanded and received a $25 million payment from a competing railroad, Norfolk Southern, in exchange for waiving certain non-compete restrictions when its former chief operating officer left to join Norfolk.

**C.    Union Pacific Takes Reasonable Measures to Safeguard Its Confidential and Trade Secret Information**

35. Union Pacific takes active measures to safeguard its confidential, proprietary, and trade secret information.  All employees are required to complete regular training which covers, among other topics, protecting Union Pacific's information.  Reinhard completed this training no fewer than 8 times: on November 1, 2022, October 30, 2021, December 10, 2020, June 3, 2019, June 6,

2018, May 22, 2017, May 15, 2016, June 2, 2015.  Reinhard also completed frequent trainings on data privacy, phishing, antitrust compliance, and other topics, which was particularly important with respect to Reinhard because his position gave him access to highly confidential trade secret information on Union Pacific's computer network, which is not generally available to Union Pacific employees who do not have a "need to know."

36. In addition, Union Pacific's computer systems require secure authentication verification for access.  Once logged into Union Pacific's computer network, and only after the user used their authentication token or third-party authenticator, employees are further restricted to only those files and databases necessary to complete their specific jobs.

37. To further secure the Confidential Information and trade secrets, Union Pacific also has security at all entrances of its headquarters where Reinhard worked.  Each entrance has turnstile barriers to enter the building which require an access card for authorized employees to access. Each employee upon hire, and following background checks, receives a key card to allow and record access to the building.  The access cards also restrict entry only to areas for which the employee needs access. Visitors are required to provide lawful identification, register their attendance, obtain visitor badges, and must be accompanied within the building by the employee they are visiting.

**D.    <u>Reinhard Departs from Union Pacific and Performs Unlawful Work in His New Role at CPKC</u>**

38. Reinhard resigned from Union Pacific in February 2024, at which point he refused to identify his new role.  As a result, Union Pacific ended his employment effective immediately and Reinhard was escorted from Union Pacific's premises.  Union Pacific also reminded Reinhard of his post-employment obligations to Union Pacific, including his duty not to use, disclose, or otherwise misappropriate confidential Union Pacific information.

39. Reinhard began employment with CPKC soon after resigning from Union Pacific.

40. According to CPKC's counsel, Reinhard is working for CPKC in a sales position with responsibilities for sales to IMCs, which contract with OEMs for door-to-door intermodal shipping services for auto parts. These IMCs serve in the same capacity as Loup, and both compete for the same ultimate OEM customers to provide the same services.

41. In his role at CPKC, Reinhard cannot help but use his intimate knowledge of Union Pacific's Confidential Information and Trade Secrets because it requires him to sell or help sell the same service to the same customers as he worked with at Union Pacific.

42. Upon information and belief, in his position with CPKC, Reinhard has participated and will participate in meetings with carriers, IMCs, and OEMs—or otherwise assist IMCs with their communications and marketing to OEMs—such that he has used and disclosed, and inevitably will continue to use and disclose, Union Pacific's Confidential Information and Trade Secrets for CPKC's benefit (and the benefit of its IMC customers) in selling to the OEMs with which he worked at Union Pacific, to Union Pacific's detriment.

43. The pricing information that Reinhard helped develop, accessed, and used during his employment with Union Pacific is and will be critically helpful to him in his role with CPKC, to Union Pacific's detriment, because he has or will use and/or share that information with IMCs to win business from the same customers with which he worked at Union Pacific. In his current role at CPKC, Reinhard will help generate business for CPKC in-part by helping its customer IMCs market to OEMs, directly competing with Loup and Union Pacific. A key component of how Reinhard's position increases revenue for CPKC is by helping the IMCs that contract with CPKC to obtain more business from OEMs—which in turn leads to them shipping more freight with CPKC. Meanwhile, Reinhard's work at Union Pacific involved selling to OEMs in the auto parts

industry—the exact same industry in which he now works at CPKC.  Reinhard's knowledge of the prices that OEMs paid to Union Pacific, and other aspects of their contracts, will also enable CPKC to undercut Union Pacific prices  (and assist its customer IMCs to price their services) in a manner designed to divert business from Union Pacific, specifically with respect to customers with which Reinhard worked at Union Pacific.

44. In sum, at CPKC, Reinhard will necessarily use, disclose, and rely on the Confidential Information and Trade Secrets he obtained at Union Pacific. Reinhard cannot "unlearn" that which he already knows—and in the specific role to which he has been assigned, there is no way for him to ignore the information in his head while performing his duties.

45. By way of example, Reinhard will inevitably rely on Confidential Information and Trade Secrets gained from Union Pacific when he decides on prices to offer to actual and potential clients of CPKC and its IMCs, as he cannot disregard prior knowledge regarding the prices Union Pacific would offer those same clients and the profit margins Union Pacific would generate through those sales.  Any work involving his prior clients at Union Pacific, and any work regarding the service of OEMs or IMCs that service OEMs, will necessarily "bake in" the underlying knowledge he gained while at Union Pacific, granting unfair advantage to CPKC.

46. By way of additional example, Reinhard necessarily will rely upon prior knowledge of confidential service preferences, contractual requirements, and/or terms and conditions for Union Pacific clients, when he helps sell or provide the same services and obtain contracts with the same clients with which he worked at Union Pacific.  Even if there is a potential intermediary between those clients and CPKC—which Reinhard alleges, but Union Pacific disputes—Reinhard's knowledge and misuse of customer terms, services, and preferences, and disclosure of the same to

the alleged intermediaries, will generate the same result:  irreparable harm to Union Pacific for the benefit of CPKC.

47. Reinhard likewise cannot help but make use of his knowledge of Union Pacific's planned infrastructure and capital improvements. Such long-term strategic planning would be of immense use to Union Pacific's competition. In his current position, Reinhard would use knowledge of Union Pacific's long-term planning and projected business to inform analysis of prices and services to offer CPKC's clients now and in the future.  Knowledge of Union Pacific's long-term plans will likely sustain Reinhard's ability to compete unfairly well into the future.

**E.    The Imminent Threat to Union Pacific's Business.**

48. The threat of irreparable harm described above is not merely theoretical, and it is especially concerning with respect to two major Union Pacific customers.  Specifically, Union Pacific provides transportation services to a number of automobile manufacturers.  Union Pacific's contracts with two of these businesses—both of which Reinhard personally serviced in-depth at Union Pacific—make up hundreds of millions of dollars in annual revenue.

49. Union Pacific is currently in negotiations with these two manufacturers for renewal contracts.  As an employee with total insight and access to Union Pacific's price structuring and costs, Reinhard had day-to-day contact with representatives of these manufacturers for much of his tenure at Union Pacific and managed their accounts, as well as the contracts currently open for negotiation. His work granted him in-depth knowledge into the full scope of Union Pacific's dealing with these businesses, including confidential rate prices, component costs, and per diem charges, as well as other confidential information related to contract negotiations.

50. Reinhard is in a prime position to make use of the Confidential Information and Trade Secrets developed by Union Pacific, in connection with these exact contracts, to improperly and unfairly steer the very same contracts to his new employer, CPKC.

51. Though CPKC does not have an in-house IMC, it contracts with IMCs to ultimately provide transportation services to OEMs.  Some of those IMCs contract with CPKC on an exclusive basis.  In conjunction with an IMC that contracts with CPKC, Reinhard can use the Confidential Information and Trade Secrets he learned from Union Pacific to custom-tailor a bid to the two automobile manufacturers specifically designed to undercut Union Pacific's costs while still winning an enormous amount of business for CPKC, potentially in the ***hundreds of millions of dollars*** of annual revenue.  Further, Reinhard developed personal customer relationships with key individuals at both manufacturers, through his work for Union Pacific, and can leverage those relationships to try to steer their business away from Union Pacific to CPKC as well.  Upon information and belief, CPKC assigned Reinhard to his current role, and he accepted the role, for that exact purpose.

52. Given that negotiations for these contracts are currently ongoing and the nearness of their expiration, urgent action is required to ensure that CPKC and Reinhard do not make illegal and improper use of Union Pacific's protected Confidential Information and Trade Secrets to harm Union Pacific's business and customer goodwill in connection with these contracts.  Because these contracts are so large, their loss would not just be monetary—it would have broader impacts on Union Pacific's business, causing irreparable harm.

**F.     CPKC Fails to Adequately Explain Defendants' Unlawful Conduct**

53. On March 1, 2024, Union Pacific, through counsel, wrote to CPKC to advise that Defendants' conduct was under investigation and to inquire whether a reasonable resolution could

be reached short of litigation to protect Union Pacific's confidential information, trade secrets, and its other legal rights.

54. Counsel for CPKC responded by letter dated March 7, Union Pacific's counsel responded in turn by letter dated March 15, and CPKC's counsel replied on March 21. Through this exchange of correspondence, Union Pacific sought information to assess whether Reinhard will solicit his former Union Pacific customers in connection with his work at CPKC, and whether he will use the confidential Union Pacific information in his head to further that objective. Instead of assuaging Union Pacific's concerns, CPKC knowingly responded with false information, erroneously claiming that Reinhard does not possess confidential Union Pacific information in his head, even though he clearly does have such knowledge. Further, CPKC declined to provide adequate assurance that it will prevent Reinhard from working with or soliciting his former Union Pacific customer OEMs, in connection with his efforts to generate business for CPKC's partner ICMs (and thus for CPKC itself). Instead of responding to Union Pacific's direct questions requesting such an assurance, CPKC tried to avoid those questions with erroneous arguments and with misleading statements regarding the nature of Reinhard's work. Ultimately, in lieu of providing true and adequate assurances, CPKC responded with misdirection and deception instead.

55. CPKC and Reinhard have full knowledge of Reinhard's contractual obligations to Union Pacific and his possession and inevitable misuse of Union Pacific trade secrets. Yet, Reinhard's breach of his Terms and Conditions, CPKC's tortious interference with that contract, and their joint decision to put Reinhard in a role in which he inevitably will misappropriate Union Pacific's trade secrets, are all ongoing.

<u>**COUNT ONE**</u>
**Violation of the Defense of Trade Secrets Act**
**(as to all Defendants)**

56. Union Pacific repeats and realleges the allegations made in each of the foregoing paragraphs as though fully set forth herein.

57. The actions of Reinhard and CPKC, as described above, constitute violations of one or more provisions of the Defend Trade Secrets Act of 2016 ("DTSA").

58. Under the DTSA, "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

59. The DTSA further provides that "a court may grant an injunction—to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable . . ." 18 U.S.C. § 1836(b)(3)(A).

60. By engaging in the conduct described above, Reinhard and CPKC have misappropriated and threatened to misappropriate Union Pacific's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce. For example, these trade secrets include the Company's pricing and operations strategy, route structures, transportation control systems, dispatch systems, service product offerings, revenue information, customer information, information relating to the Company's intermodal operations, transportation plans, and Union Pacific's growth plans and associated capital investments.

61. Reinhard and CPKC have misappropriated and threatened to misappropriate other Union Pacific trade secrets used in interstate or foreign commerce, including the terms of confidential contracts with Union Pacific clients; profit margins of services provided by Union Pacific to certain clients; revenue figures tied to certain clients; and per diem and other rates.

62. Union Pacific has taken reasonable measures to keep this information secret by (1) requiring Reinhard and others with access to such information to sign the Terms and Conditions; (2) requiring its employees to acknowledge and comply with information security terms of use upon logging in to a Union Pacific computer; (3) using passwords before employees could sign in to confidential databases; (4) requiring two-factor authentication before employees could sign in to protected databases; (5) requiring employees to undergo regular training regarding data privacy and phishing prevention; and (6) promulgating, maintaining, and enforcing an information governance policy, in part to protect the confidentiality of business information and protect sensitive information which requires employees to maintain the confidentiality of Union Pacific's trade secret, confidential, and attorney-client privileged information.

63. Union Pacific also maintains a business ethics policy that requires all employees to guard against the unauthorized use or disclosure of company assets, including information unknown to the public and proprietary information.

64. These trade secrets are related to Union Pacific's railroad transportation business, which Union Pacific uses in interstate commerce. For example, Union Pacific's pricing information, capital investment plans, and routing infrastructure affect the services and operation of a railroad running across the borders of twenty-three states.

65. Without authorization, Reinhard and CPKC misappropriated or threaten to misappropriate these trade secrets by, among other things, using and disclosing, or threatening to use and disclose, the trade secrets without Union Pacific's consent. Reinhard owes a duty to Union Pacific to maintain the secrecy of the trade secrets and limit the use of the trade secrets. Reinhard's (and CKPC's by virtue of its employment of Reinhard) acquisition or threatened acquisition of the trade secrets was by improper means.

66. The trade secrets derive independent economic value and benefit from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic benefit from the disclosure or use of the information.

67. Union Pacific communicated these trade secrets to Reinhard in confidence.

68. Upon information and belief, Reinhard intends to convert the trade secrets to the economic benefit of Reinhard and CPKC, without Union Pacific's consent, for use at CPKC.

69. Union Pacific's trade secrets are not generally known to, and are not readily ascertainable through proper means by, CPKC.

70. Reinhard and CPKC can obtain economic value for the disclosure and use of Union Pacific's trade secrets, for example by using that information to solicit or induce Union Pacific's customers to switch their business from Union Pacific to CPKC.

71. CPKC acquired, received, and possesses, or inevitably will acquire, receive, and possess, the trade secrets, knowing those trade secrets have been misappropriated without Union Pacific's authorization and in violation of Reinhard's contractual commitments to Union Pacific.

72. Because of the foregoing, Union Pacific has suffered and will continue to suffer irreparable harm, injury, and loss.

**<u>COUNT TWO</u>**
**Violation of the Nebraska Trade Secrets Act**
**(as to all Defendants)**

73. Union Pacific repeats and realleges the allegations made in each of the foregoing paragraphs as though fully set forth herein.

74. The actions described above constitute a violation of the Nebraska Trade Secrets Act.

75. As an employee of Union Pacific, Reinhard became privy to a number of trade secrets necessary for him to perform his duties. These trade secrets include information on the Company's

pricing and operations strategy, route structures, transportation control systems, dispatch systems, service product offerings, revenue information, customer information, information relating to the Company's intermodal operations, transportation plans, and Union Pacific's growth plans and associated capital investments.

76. This information provides important value to Union Pacific's business. Union Pacific used this information, in conjunction with Reinhard's work and services, to solicit and develop business from customers; plan its routes and infrastructure to provide the most competitive service to those customers while maintaining profitability; and planning future investments in the Company's infrastructure.

77. This information belongs to Union Pacific, as shown in part by the Terms and Conditions that Union Pacific requires its senior employees to sign. The information is generated by Union Pacific employees during their work for Union Pacific for its exclusive use in furthering Union Pacific's business.

78. Reinhard was employed in a position of trust and confidence to use this information in helping solicit business for Union Pacific and develop Union Pacific's logistical and infrastructural plans.

79. Upon information and belief, Reinhard has communicated these trade secrets to CPKC and other entities that are working with CPKC, and threatens to continue to do the same, so that CPKC may use that information in direct competition with Union Pacific. Upon information and belief, this use has prejudiced Union Pacific.

80. These circumstances are inequitable and unjust because Reinhard violated his contractual, statutory, and common law obligations to Union Pacific and disclosed those secrets to a direct competitor, CPKC.

81. Because of the foregoing, Union Pacific has suffered and will continue to suffer irreparable harm, injury and loss.

## COUNT THREE
### Breach of Contract
### (as to Defendant Reinhard)

82. Union Pacific repeats and realleges the allegations made in each of the foregoing paragraphs as though fully set forth herein.

83. Union Pacific has fully performed all of its obligations under the Terms and Conditions, which is an enforceable contract.

84. All conditions precedent to the bringing of this action have occurred, been performed, or been waived.

85. Reinhard was and continues to be bound by the restrictive covenants in the Terms and Conditions, including covenants of non-competition, non-solicitation, and non-disclosure.

86. The restrictive covenants in the Terms and Conditions are governed by Nebraska law because Nebraska is the state in which Reinhard's employment with Union Pacific was based. *See* Terms and Conditions ¶ 10.

87. The restrictive covenants in the Terms and Conditions are supported by adequate consideration, including at the outset a prospective award of performance stock units (subject to Reinhard's compliance therewith), and are valid and enforceable.

88. Given the nature of Union Pacific's business, Reinhard's status within Union Pacific, his exposure to Union Pacific's Confidential Information and Trade Secrets, and the high compensation paid for his obligations, the restrictive covenants are reasonable in duration, geographic scope, and scope of prohibited activity.

89. The restrictive covenants were necessary and reasonably tailored to protect Union Pacific's legitimate business interests, including but not limited to Union Pacific's goodwill, relationships with existing and prospective customers and other stakeholders in the railway business community, and its Confidential Information and Trade Secrets. The non-compete restrictions in the restrictive covenants are designed only to prevent Reinhard from improper interference with the customers with which he worked at Union Pacific, and/or the misappropriation of confidential information and trade secrets.

90. In the Terms and Conditions, Reinhard affirmed that "each of the restraints contained herein is, in consideration for, and necessary for the protection of the goodwill, Confidential Information, Trade Secrets and other legitimate interests of the Company; that each and every one of these restraints is reasonable in respect to subject matter, length of time and geographic area, to the extent they apply in the State in which your employment with the Company is based; and that these restraints, neither individually nor in the aggregate, will not prevent you from obtaining other suitable employment during the period in which you are bound by such restraints." Terms and Conditions ¶ 6.

91. Reinhard further agreed that if Reinhard breached any of the restrictive covenants in Section 5 of the Terms and Conditions, "the damage to the Company would be irreparable," and, among other remedies, Union Pacific would "be entitled to injunctive relief against [Reinhard's] breach or threaten[ed] breach of said covenants." *Id.*

92. Reinhard has breached the Non-Competition Covenant through his performance of a specific assignment in CPKC, in which he has used or inevitably will use Union Pacific's confidential information to divert customers with which he worked at Union Pacific to go to CPKC instead.  The terms of the Non-Competition Covenant are eminently reasonable and enforceable

22

in Nebraska, as they are specifically limited to circumstances, such as these, in which the particular role to which Reinhard has been assigned gives rise to an imminent threat of unlawful conduct by Reinhard and his new employer, including solicitation of the precise customers with which Reinhard previously worked at Union Pacific.

93. Reinhard, through his assignment with CPKC, is engaged in activity that is the same or substantially the same as or competitive with the Business, as defined in the Terms and Conditions.  CPKC could have assigned Reinhard to a role in which he would have been able to leverage his own skills and experience without simultaneously using confidential information or customer relationships he acquired at Union Pacific—for example, he could have been assigned to work with customers in a different industry, rather than auto parts.  Instead, CPKC and Reinhard chose to assign him to a role in which his misappropriation of Union Pacific confidential information and trade secrets, and attempted or actual diversion of his own former customer relationships, is inevitable.

94. Reinhard's actual and expected material breaches of the covenants in the Terms and Conditions not only have and will continue to deprive Union Pacific of the benefit of its bargain with Reinhard but also will cause irreparable harm to Union Pacific's goodwill, customer relations, market share, and competitive advantage in the marketplace.

95. Reinhard also agreed that Union Pacific may seek "injunctive relief" to enforce the covenants in Section 5 of the Terms and Conditions, in a court of competent jurisdiction, notwithstanding Reinhard and Union Pacific's agreement to arbitrate in the Terms and Conditions. *Id.*  Union Pacific specifically reserves the right to pursue arbitration of its claims against Reinhard while this action is pending, but brings this action against Reinhard to ensure its ability to seek preliminary injunctive relief in aid of arbitration, in accordance with the Terms and Conditions.

96. As a proximate result of Reinhard's breaches of the Terms and Conditions, Union Pacific has suffered monetary damages that cannot be reasonably ascertained at this time.

97. Union Pacific has no adequate remedy at law and will suffer substantial and irreparable harm unless Reinhard is enjoined.

98. Because of the foregoing, Union Pacific has suffered and will continue to suffer irreparable harm, injury, and loss.

## <u>COUNT FOUR</u>
**Tortious Interference with Contract**
**(as to CPKC Defendants)**

99. Union Pacific repeats and realleges the allegations made in each of the foregoing paragraphs as though fully set forth herein.

100.    Reinhard's Terms and Conditions is a valid and enforceable contract.

101.    CPKC had knowledge of the Terms and Conditions and its terms, including its restrictive covenants, but nevertheless intentionally induced Reinhard to breach this agreement.

102.    Reinhard breached his Terms and Conditions because of CPKC's improper inducement.

103.    CPKC has intentionally and without justification interfered with the contractual relationship between Union Pacific and Reinhard.

104.    Reinhard would not have breached his Terms and Conditions but for CPKC's tortious conduct.

105.    Union Pacific has suffered and will continue to suffer injury and irreparable harm as a result of CPKC's tortious interference.

106.    Union Pacific has no adequate remedy at law and is entitled to and seeks injunctive relief as a result thereof.

107.   As a result of CPKC's tortious interference, Union Pacific has suffered and continues to suffer great, immediate, and irreparable harm. In addition, Union Pacific has suffered damages in an amount to be determined at trial.

108.   Union Pacific has a substantial likelihood of success on the merits of this claim and immediate injunctive relief would serve the public interest.

**COUNT FIVE**
**Unjust Enrichment**
**(as to all Defendants)**

109.   Union Pacific repeats and realleges the allegations made in each of the foregoing paragraphs as though fully set forth herein.

110.   To the extent Defendants have obtained or will obtain any income or financial benefit as a result of their foregoing conduct, they are unjustly enriching themselves at Union Pacific's expense.

111.   Justice and fairness require that Union Pacific recover any such income or financial benefit from Defendants.

**COUNT SIX**
**Breach of Fiduciary Duty (Loyalty)**
**(as to Defendant Reinhard)**

112.   Union Pacific repeats and realleges the allegations made in each of the foregoing paragraphs as though fully set forth herein.

113.   Reinhard owed Union Pacific a fiduciary duty as a high-ranking employee privy to Union Pacific's confidential information. "Under Nebraska law, it is a generally recognized principle that an employee owes a duty of loyalty to his employer during the course of his employment ... irrespective of the existence of a covenant not to compete or nonsolicitation clause." *W. Plains, L.L.C. v. Retzlaff Grain Co. Inc.*, 870 F.3d 774, 786 (8th Cir. 2017).

114.    In exchange for valuable consideration, Reinhard agreed that his duty was ongoing after the end of his employment with Union Pacific for a reasonable time period.

115.    Upon information and belief, Reinhard breached his duty of loyalty to Union Pacific by, amongst other actions, taking confidential information and/or beginning his efforts to divert customer relationships to CPKC before the end of his employment with Union Pacific, as well as afterward.

116.    Upon information and belief, by breaching that duty, Reinhard has caused and will cause ongoing harm to Union Pacific through the unfair loss of customers, sales, goodwill, and market share to CPKC's and Reinhard's benefit. Though Union Pacific will ultimately seek money damages in related arbitration, the ongoing breach of loyalty is causing irreparable harm to Union Pacific.

**COUNT SEVEN**
**Civil Conspiracy**
**(as to all Defendants)**

117.    Union Pacific repeats and realleges the allegations made in each of the foregoing paragraphs as though fully set forth herein.

118.    By the above-described acts, Defendants CPKC and Reinhard conspired together to unlawfully injure Union Pacific's business.

119.    Upon information and belief, CPKC knowingly and willfully enticed, procured, and/or caused Reinhard to begin employment with it in violation of his ongoing obligation to Union Pacific, as well as state and federal law.

120.    Defendant Reinhard accepted this employment and willingly began work for CPKC, where, upon information and belief, he makes use of, and/or will make use of, confidential information learned at his time at Union Pacific and client relationships he obtained through his

work at Union Pacific. Such use has and will continue to violate the Terms and Conditions Reinhard signed, as well as state and federal law.

121.    By these actions, CPKC and Reinhard combined and by their concerted activity accomplished an unlawful or oppressive object, to wit, the violation of the state and federal common law and statutory rights set forth elsewhere in this Complaint.

122.    In the alternative, by such combination, Reinhard and CPKC accomplished a lawful object by unlawful or oppressive means.

123.    Upon information and belief, Reinhard and CPKC had an express or implied agreement to commit the above-described conduct. These acts constitute torts and other offenses against Union Pacific.

124.    Union Pacific has suffered and will suffer irreparable harm and damages as a result of Defendants' civil conspiracy, in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Union Pacific respectfully requests the Court award the following relief against Defendants:

1.    Union Pacific is contemporaneously filing an arbitration demand against Reinhard pursuant to the Terms and Conditions and, in aid of that arbitration, here seeks a temporary restraining order and preliminary injunction enjoining and restraining Reinhard, and anyone acting in concert with Reinhard, from violating or participating in the violation of any of the terms of the Terms and Conditions or any other legal or equitable violations against Union Pacific pending the arbitration, including but not limited to using, disclosing, or misusing any Confidential Information or Trade Secrets of Union Pacific, and requiring Reinhard to return any Confidential Information or Trade Secrets of Union Pacific in Reinhard's possession; and

2.      In the event Reinhard successfully opposes the arbitrability of Union Pacific's claims against him, Union Pacific then reserves the right to seek additional relief in this action in the form of a permanent injunction and damages; and

3.      An order permitting Union Pacific to conduct expedited discovery in advance of a preliminary injunction hearing; and

4.      As to CPKC, an order awarding Union Pacific its actual and exemplary damages, in an amount to be determined at trial, as well as preliminary and permanent injunctive relief; and

5.      An order awarding Union Pacific its pre- and post-judgment interest as allowed by law, and its attorneys' fees and costs; and

6.      An order awarding such other further relief in favor of Union Pacific as the Court finds just and proper.

## DESIGNATION OF PLACE OF TRIAL

Union Pacific designates Omaha, Nebraska for the place of trial.

Respectfully submitted,

DATED: March 28, 2024

By: */s/ Christopher R. Hedican*
Christopher R. Hedican (#19744)
Of Baird Holm LLP
1700 Farnam St. Ste, 1500
Omaha, NE 68102-2068
Phone: 402-344-0500
Fax: 402-344-0588
chedican@bairdholm.com

MORGAN, LEWIS & BOCKIUS LLP

Damon C. Elder (*pro hac vice* application forthcoming)
1301 Second Ave., Suite 2800
Seattle, WA 98101-3807
Telephone: (206) 274-0180
damon.elder@morganlewis.com

Michael P. Jones (*pro hac vice* application forthcoming)
1000 Louisiana, Suite 4000
Houston, Texas 77002
Telephone: (713) 890-5000
michael.jones@morganlewis.com

*Attorneys for Plaintiffs Union Pacific Corporation,*
*Union Pacific Railroad Company, and Loup Logistics*
*Company LLC*

6325016.1